# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1374V

| | |
|---|---|
| LISA SULLIVAN, | Chief Special Master Corcoran |
| Petitioner, | |
| v. | Filed: November 18, 2024 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Phyllis Widman, Widman Law Firm, LLC, Linwood, NJ,* for Petitioner.

*Michael Joseph Lang, U.S. Department of Justice, Washington, DC,* for Respondent.

## FACT RULING DISMISSING TABLE CLAIM[1]

On September 26, 2022, Lisa Sullivan filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"), alleging that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination administered to her on June 16, 2017.[3] Pet., ECF No. 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Because this Ruling contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] The instant claim was filed within one year of the dismissal of Petitioner's state civil court action for the alleged vaccine-related injury. *See* Pet. ¶¶ 4-12 (filed September 26, 2022); *see also* Ex. 20 (dismissing Petitioner's civil action on September 27, 2021).

For the reasons discussed below, I find it more likely than not that another condition or abnormality is present that could explain Petitioner's alleged injury, meaning a Table element cannot be met. Petitioner's Table claim is therefore **DISMISSED** (although the matter could proceed as a causation-in-fact claim).

## I.    Relevant Procedural History

In June 2024 (nearly two years after initiation of the instant claim), Respondent reported that the medical review of this case could not be completed, and thus his position could not be provided, without a transcription of Petitioner's Exhibit 10 – a handwritten medical record from Petitioner's treating neurologist. ECF No. 45 at 1. After several unsuccessful efforts to obtain the transcribed record, Petitioner was granted subpoena authority to produce the record. ECF Nos. 50-51. But Petitioner's treating neurologist refused to comply with the subpoena without receiving compensation up front (at his hourly rate of $500/hour). ECF No. 52.

Prior to granting Petitioner's treater's request for payment to transcribe the record, I attempted to discern from the parties how critical the subject medical notes were to the claim's resolution. *See* ECF No. 53. Respondent thereafter maintained that the record was of critical importance given the treating neurologist's primary clinical diagnosis of complex regional pain syndrome ("CRPS"). *Id.* After conducting my own preliminary review of the record, however, I informed the parties that even without a transcription of Exhibit 10, the existing record revealed that Petitioner's CRPS diagnosis (made or held by other treating physicians aside from her treating neurologist) had ample corroboration – and therefore that a Table claim was not likely viable. *Id.* I thus suspended resolution of this discovery dispute. *Id.* Resolution of Petitioner's Table claim is now ripe for consideration.

## II.    Relevant Factual Evidence[4]

On June 16, 2017, following an incident in her profession as a registered nurse, Petitioner received the subject Tdap vaccine in her left deltoid. Ex. 1 at 4. In her September 2022 affidavit, Petitioner states that "[i]mmediately following the injection, [she] experienced severe burning and tingling pain in [her] posterior shoulder and neck[;]" she therefore returned to the emergency department ("ED") later that same day. Ex. 19 ¶ 6. The contemporaneous medical records further state that "several hours after the tetanus shot to [the] left upper arm, [Petitioner] return[ed] for evaluation of persistent pain at injection site and decreased [range of motion ("ROM")] [due to] pain, distal [nerve]

---

[4] Only those facts relevant to the presence of an alternate cause that could potentially explain Petitioner's post-vaccination condition will be discussed herein, although other facts may be included as necessary.

sensation intact . . . no obvious erythema or swelling." Ex. 1 at 3. No examination was performed, or treatment recommended. *See generally,* Ex. 1.

The next day (June 17, 2017), Petitioner went to a different ED complaining of "left shoulder pain that started after getting her tetanus shot in her left shoulder yesterday." Ex. 2 at 1. The triage note states Petitioner also had "burning across [her] shoulder and neck." *Id.* at 19. Petitioner reported pain in the anterior lateral and posterior aspects of the shoulder, which was made worse with motion. *Id.* at 1. An examination showed tenderness, decreased active and passive ROM "secondary to pain," increased pain with external rotation, and positive impingement signs. *Id.* at 2. The treater noted Petitioner was "examining likely rotator cuff pathology perhaps impingement syndrome or bursitis. Questionable etiology. Hard to ascertain the injection was in the subacromial space." *Id.* at 3. She was prescribed prednisone. *Id.* at 15. An x-ray revealed "no acute findings" but "mild degenerative change of the left acromioclavicular [("AC")] joint." *Id.* at 3, 12.

Petitioner saw an orthopedist on June 21, 2017, noting immediate pain upon receiving her Tdap vaccine and which had continued. Ex. 3 at 1. An examination showed tenderness along the lateral margin of the acromion overlying the superior aspect of the humerus and limitations with active ROM. *Id.* at 2-3. The orthopedist noted that a June 19, 2017 MRI showed evidence of subacromial inflammation, "but her supraspinatus and infraspinatus tendon are intact with no obvious defects or fluid collection within the tendons themselves." *Id.* at 3. Petitioner was assessed with a strain of muscles and tendons of the rotator cuff; she received a steroid injection. *Id.* Two months later, on September 22, 2017, Petitioner had an orthopedic follow up visit, during which she received a repeat steroid injection. *Id.* at 7.

On October 11, 2017, Petitioner underwent a second MRI that confirmed the existence of "linear signal abnormality involving the insertion of the distal anterior fibers of the supraspinatus tendon at the anterior facet of the greater tuberosity [which] may represent subtle rim rent tear." Ex. 3 at 9. The MRI also showed a small volume of subacromial subdeltoid bursal fluid. *Id.*

Petitioner followed up with her orthopedist's office on December 12, 2017.[5] Ex. 5 at 1. She reported that her last steroid injection "helped her very much but for not a long period of time . . . she is still having significant issues." *Id.* at 2. Petitioner described her

---

[5] The petition states that beginning in October 2017, Petitioner attended physical therapy but was discharged in December because her pain was so severe. Pet. ¶ 36 (citing Ex. 4). Exhibit 4 is a one-page discharge summary noting that Petitioner indeed attended six sessions but was discharged due to her "lack of progress due to high pain." Ex. 4 at 1. However, the complete records for Petitioner's course of treatment with PT cannot be gleaned from the existing record. I therefore will not rely on such treatment between October and December 2017 in this Ruling.

pain as throbbing, sharp, and stabbing but reported "no numbness or tingling down the arm[.]" *Id.* She was assessed with shoulder pain and impingement syndrome. *Id.* at 3. The orthopedist discussed treatment options with Petitioner, including surgery or additional injections. *Id.* at 2-3.

Petitioner sought a second opinion with another orthopedist on January 17, 2018. Ex. 6 at 8. Petitioner now reported that she had received a tetanus shot last June and felt "immediate pain, burning in her shoulder at the time of the injection." *Id.* She also "gets occasional radicular complaints into her arm and hand" plus "some numbness around her shoulder." *Id.* The physician noted that Petitioner's diagnostic workup "failed to demonstrate subacromial space pathology." *Id.* Upon examination, Petitioner exhibited pain with active ROM and external rotation and positive impingement signs due to pain. *Id.* Petitioner was assessed with an "injury of [the] left axillary nerve" and biceps tendinitis. *Id.* at 9. The physician felt that Petitioner "had [an] axillary nerve injection at the time of her tetanus shot" and "this is a neurapraxic type injury." *Id.*

Petitioner established care with a physical medicine specialist on February 8, 2018. Ex. 8 at 1. Petitioner reiterated that she experienced immediate pain upon injection but also that "[s]ince September 2017, she has noted [a] numbness/tingling sensation in the left 4th/5th fingers. Occasionally she noted [numbness/tingling] in other fingers." *Id.* An EMG performed the same day was "abnormal" with evidence of "left ulnar neuropathy consistent with Cubital Tunnel Syndrome." *Id.* at 2. The physician noted that Petitioner's clinical symptoms on examination were also consistent with an ulnar neuropathy and that the elbow "could be subluxed due to her increased forearm activities while compensat[ing] for shoulder pain." *Id.* However, the physician believed that "most of [Petitioner's] pain stems from her left shoulder." *Id.* at 3. Petitioner was assessed with left ulnar neuropathy, left carpal tunnel syndrome, and left subacromial bursitis. *Id.* at 2-3.

On March 6, 2018, Petitioner underwent a left shoulder arthroscopy and subacromial decompression for persistent pain "following a SIRVA-type incident." Ex. 6 at 2. The "indications for surgery" notes state that Petitioner's EMG was "negative for [an] axillary nerve motor injury." *Id.* During a post-operative follow up one week later, Petitioner reported no pain with gentle passive ROM. *Id.* at 6.

Despite this reported initial improvement following surgery, Petitioner followed up with her physician on April 2, 2018, and complained of a resurgence of symptoms. Ex. 6 at 4. Specifically, pain in the posterior aspect of her shoulder that "does not extend down her arm" and "is not associated with numbness or tingling into her hands." *Id.* An examination showed generalized tenderness through the deltoid area, pain with passive ROM, and resistance with internal/external rotation. *Id.* The physician referred to

Petitioner's clinical surgical findings and noted that "[w]hile there was bursitis at the time of her surgery, it was not as extensive as one would have thought given her symptoms." *Id.* Petitioner was assessed with bicipital tendinitis of the left shoulder. *Id.* The physician maintained his previous opinion – that "this represents some form of axillary nerve or sensory nerve injury" and he referred Petitioner to a pain specialist. *Id.*

Petitioner was evaluated by a pain management specialist on April 18, 2018. Ex. 9 at 1. She complained of left upper extremity "radicular pain," described as "aching, pressure, weakness, numbness, hot/burning." *Id.* She also stated that her pain is associated with "muscle spasms [and] motor deficits" and that it increases with activity, bending, ROM, and lifting. *Id.* Petitioner explained that her pain started on "6/16/17 after she was given a 'wrong site injection'" of a tetanus shot. *Id.* A physical examination showed tenderness to palpation and positive compression signs of the cervical spine. *Id.* Petitioner was assessed with pain in the left shoulder, radiculopathy of the cervical region, bicipital tendinitis, and CRPS of an unspecified upper limb – for which she was prescribed opioids and gabapentin. *Id.* at 1-2.

On May 11, 2018, Petitioner followed up with her pain management specialist to receive her first stellate ganglion block[6] to treat her "CRPS/sympathetically mediated arm pain." Ex. 9 at 7. When she returned on May 22, 2018, Petitioner reported the treatment provided "60% relief of symptoms that is still ongoing . . . the pain comes and goes." *Id.* at 10. Petitioner received a second stellate ganglion block on May 31, 2018, which provided ">60% relief of symptoms" (reported on June 5, 2018). *Id.* at 14, 16. She also reported a recent visit to the ED due to a severe headache, abdominal pain, nausea, and vomiting (which she had likewise experienced three weeks prior). *See,* e.g., *id.* at 16. During Petitioner's July 3, 2018 pain management follow up, she reported "50% relief with the current analgesic regimen." *Id.* at 19. She also informed the physician that she had recently seen a neurologist[7] "for her abdominal pain." *Id.* Petitioner was given refills of her prescription medications. *Id.* at 20.

Later that month (on July 25, 2018), Petitioner began physical therapy ("PT") for her CRPS. Ex. 11 at 123. She explained that it feels like her arm is "dissociated form [sic] her body" and that her pain is "shooting and ach[ing] into her arm and needles into her arm." *Id.* Petitioner also reported episodes of body sweats and abdominal pain that reaches to

---

[6] A stellate ganglion block is an injection of anesthetic medication into the collection of nerves called the "stellate ganglion" located in the neck. *Stellate Ganglion Block,* Cleveland Clinic, https://my.clevelandclinic.org/health/treatments/17507-stellate-ganglion-block (last visited Nov. 14, 2014). Such treatment is intended to relieve pain in the head, neck, upper arm, and chest caused by CRPS and/or other vascular diseases. *See id.*

[7] Petitioner's treatment with the neurologist will not be discussed herein, as the record has not been transcribed. As stated above, I thus will not rely on its contents in ruling on Petitioner's Table claim.

her back. *Id.* Following a physical evaluation, the therapist noted that Petitioner exhibited "evidence of left capsular restrictions that are not consistent with adhesive capsulitis." *Id.* The physical therapist agreed with Petitioner's CRPS diagnosis and recommended six weeks of PT. *Id.* at 126.

Petitioner saw a hand and shoulder specialist on September 10, 2018. Ex. 12 at 1. She described her history consistent with that above, also noting that her "abdominal symptoms [were] related to her CRPS." *Id.* After reviewing Petitioner's prior imaging (including a July 2018 MRI showing narrowing with spondylitic spurring and central canal stenosis),[8] the specialist assessed Petitioner with left cubital tunnel syndrome, mild left carpal tunnel syndrome, cervical spine disc disease with spondylitic spurring and central canal stenosis, "status post wrong site tetanus injection into the subacromial space," and CRPS. *Id.* at 2-3. The next day (September 11, 2018), Petitioner followed up with her pain management specialist and reported that her CRPS "is now in her sinuses, which has decreased her taste and smelling senses, and in her abdomen radiating into her pelvis." Ex. 9 at 21.

On September 27, 2018, Petitioner saw a core orthopedic specialist for shoulder, arm, abdominal, and hand pain. Ex. 13 at 5. She described her shoulder pain as a "deep ache" that "shoots down into her hands and fingers[;]" her arm pain was described as "squeezing" and as a deep, intense ache in her wrist with pins and needles; her hand pain was also described as "squeezing, pins and needles, [and] burning sensation." *Id.* The physician noted that "[t]he pain is described as being very neuropathic and constant" and that it follows the "lower trunk of the brachial plexus." *Id.* A neurological examination (showing, in part, decreased sensory and motor function, swelling, and discoloration of the skin) was consistent with CRPS and Petitioner was assessed with the same. *Id.* at 8.

Petitioner underwent a musculoskeletal ultrasound of her left neck and shoulder on July 11, 2019. Ex. 13 at 3. The neck findings were consistent with "mild neuritis of the middle trunk of the left brachial plexus (plexitis)" and the shoulder showed mild tendinosis of the supraspinatus, infraspinatus, and biceps tendons without tears or bursitis. *Id.* at 3-4. The shoulder pathology also revealed mild AC joint osteoarthritis. *Id.* at 4.

During an August 13, 2019 follow-up with the core orthopedic specialist, Petitioner exhibited inflammation of the brachial plexus. Ex. 13 at 14. She also reported neurological symptoms including tremors and weakness. *Id.* at 15. In addition to the diagnosis of CRPS, the core specialist also assessed Petitioner with Parsonage-Turner syndrome. *Id.*

---

[8] The MRI appears to have been ordered by Petitioner's neurologist in Exhibit 10. *See,* e.g., Pet. ¶ 58; Ex. 12 at 2. While I am not relying on Exhibit 10, the results of the MRI are reproduced in Exhibit 12, and I will rely on said results as necessary.

at 16. The physician recommended ultrasound guided nerve blocks of the left brachial plexus, IVIG for Petitioner's Parsonage-Turner syndrome, and prescription medications including mexiletine. *Id.* at 17. The orthopedist maintained the assessment of CRPS (and brachial plexopathy) throughout 2019 and into 2020. *See id.* at 20, 24, 29.

By January 2020, Petitioner returned to PT for low back pain, left shoulder pain, and pain on the left side of the chest. Ex. 14 at 1. Petitioner reported that in 2017, she received a tetanus injection in the wrong site with a "possible brachial plexus injury" and that she also has cubital tunnel syndrome (shown on nerve conduction study). *Id.* The physical therapist diagnosed Petitioner with CRPS of the left upper limb and an "other intervertebral disc disorders [of the] lumbar region." *Id.* at 3. During a January 21, 2020 orthopedic follow-up, Petitioner received a lidocaine injection, which afforded her temporary improvement, followed by an ultrasound-guided nerve block injection on February 13, 2020. Ex. 13 at 22, 26.

Petitioner established care with a chronic pain specialist to manage her pain on May 14, 2020. Ex. 15 at 7. She complained of left upper extremity pain migrating to the left side of her face, the brachial plexus points of the chest wall, and left side of the abdomen, plus "sequelae of [CRPS] which include . . . hyperhidrosis, insomnia, cognitive dysfunction, heart palpitations, some left-sided lumbar spine pain, sensitivity to cold, heat, barometric pressure changes, and nausea." *Id.* Petitioner linked her discomfort to the subject June 16, 2017 vaccination. *Id.* The physician's assessment stated that "[d]ue to the incident which occurred on June 16, 2017, [Petitioner] suffers from [CRPS] of the left upper extremity with extension into the face, chest, abdomen, and left lower extremity." *Id.* at 9. Petitioner was prescribed Lamictal and said she would consider Ketamine infusions. *Id.* Petitioner received *continuous* treatment for her CRPS throughout all of 2020 and 2021. *See generally,* Exs. 9, 14.

On October 5, 2021, Petitioner underwent an "independent medical evaluation" with a different pain management specialist. Ex. 16 at 1. She reported pain in the "left neck into the shoulder that radiates into all fingers and digits . . . numbness, tingling, and burning into the hands, pulling and burning into her arms and pulling sensation across her scalp, as well as her eyes." *Id.* at 3. She also endorsed right upper xiphoid and left-sided abdominal pain. *Id.* After reviewing Petitioner's prior medical records and conducting a physical examination, the physician concluded that Petitioner suffered from "a work-related injury from a needle stick on 06/16/17. The injury appears to be consistent with chronic pain and the left shoulder, as well as disuse phenomena." *Id.* at 8. The physician opined, however, that Petitioner "does not have [CRPS], as she does not fill the diagnostic criteria. There is another etiology that explains the constellation of symptoms . . . adhesive capsulitis, which was . . . warned when previously evaluated . . .

approximately five days after the initial needle stick." *Id*. Despite this evaluation, Petitioner received continuous treatment for her CRPS through 2021 and (at least) 2022. *See generally,* Exs. 9, 14.

## III.    Authority

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[9] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a Tdap vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests *all* of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

---

[9] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may

be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## IV.    Findings of Fact regarding Another Condition or Abnormality

The record as a whole supports the conclusion that there is another "condition or abnormality" that could explain Petitioner's post-vaccination left shoulder complaints other than the subject vaccination. As articulated above, Petitioner's medical records contain multiple proposed diagnoses, with many of her treaters suspecting CRPS as the most accurate explanation for her condition. Thus, it is not facially evident that Petitioner suffered from an injury consistent with a SIRVA. Indeed, this record suggests that what may have initially been thought to be a capsulitis or impingement-type injury was deemed later to be something else when considering her evolution of symptoms.

At most, one treater opined (more than three years into her course of treatment, on October 5, 2021) that Petitioner did *not* have CRPS (but rather adhesive capsulitis as initially thought) (Ex. 16). But this singular record does not outweigh the *overwhelming* bulk of evidence that supports a CRPS diagnosis. For instance, by January 2018 – roughly seven months post vaccination - Petitioner's treaters felt that she had a left axillary nerve or neurapraxic-type injury. Ex. 6 at 8. The following month, in light of ongoing numbness, tingling, and weakness in the extremities, Petitioner underwent an EMG which confirmed the assessment of a left ulnar neuropathy, carpal and cubital tunnel syndrome, and bursitis. Ex. 8 at 1-3. In April 2018, Petitioner was ultimately diagnosed with CRPS, requiring unique treatment such as stellate ganglion blocks. Ex. 9 at 1-2, 7. This CRPS (and/or carpal/cubital tunnel syndrome) diagnosis was held and affirmed by *several* of Petitioner's treating physicians, including at least one pain specialist, physical medicine specialist, orthopedic specialists, and physical therapists (that actually found a physical examination to be inconsistent with adhesive capsulitis). *See,* e.g., Ex. 9; Ex. 11 at 123; Ex. 12 at 2-3; Ex. 13 at 7-8, 16; Ex. 14; Ex. 15 at 9. More so, Petitioner received

continuous treatment for CRPS for several years, thus further supporting that something else was attributing to Petitioner's post-vaccination condition. *See generally,* Ex. 9.

While evidence of a concurrent condition or abnormality does not *per se* mean that Petitioner could not still establish a SIRVA injury, the substantial evidence of it herein means that this Table element cannot be satisfied. There is simply too much overlap between Petitioner's shoulder and neck/arm symptoms, treatment, imaging, and diagnoses to rule out Petitioner's CRPS as explanatory of her alleged post-vaccination left shoulder symptoms. *See Durham v. Sec'y of Health & Hum. Servs.,* No. 17-1899V, 2023 WL 3196229, at *13-14 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (finding that the condition or abnormality must qualify as an explanation for the symptoms a petitioner is experiencing, but need not be a better or more likely explanation); *Lang v. Sec'y of Health & Hum. Servs.,* No. 17-995V, 2020 WL 7873272, at *12-13 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (emphasizing that "findings consistent with impingement, rotator cuff tears, or [acromioclavicular] arthritis do not *per se* preclude a finding that a Table SIRVA exists," rather the question is whether the petitioner's "shoulder pathology wholly explain[ed] her symptoms independent of vaccination."). Indeed, to establish the fourth QAI criterion, the record would need to lack a competing explanation to "muddy" a finding that vaccine administration was the cause of Petitioner's injury. *Miller v. Sec'y of Health & Hum. Servs.,* No. 20-531V, 2024 WL 3699521, at *7 (Fed. Cl. Spec. Mstr. July 8, 2024). The same cannot be accomplished here.

At bottom, it is the overall mix of evidence herein that causes me to find Petitioner's Table claim cannot be preponderantly established. At best, Petitioner might be able to prevail under the standards applicable for a causation-in-fact claim. But to do so, she would need to establish that the vaccine she received was a "substantial factor" in causing her SIRVA-like injury. Of course, to do so will require expert input, and will likely take a lengthy period of time to resolve. I therefore urge the parties to make a brief attempt at settlement before the matter is transferred out of SPU. *See* ECF No. 53.[10]

## Conclusion

Accordingly, Petitioner's Table SIRVA claim is **DISMISSED.** Petitioner shall file a joint status report indicating that she has provided Respondent with a reasonable settlement demand for her off-Table claim (and one that takes into account litigative risk in attempting to prove a non-Table SIRVA that was not localized to the shoulder and could be explained by another condition), and the parties' efforts towards informal resolution,

---

[10] Upon transfer, the special master to whom the Petition is assigned can decide if the non-transcribed, handwritten record (Exhibit 10) is vital, and if so, whether to pay the demanded cost or pursue some other avenue to resolving the outstanding discovery question.

**by no later than Friday, January 17, 2025.** If the parties do not report significant progress in their efforts, the matter will be transferred out of SPU soon thereafter.

      **IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master
